Matter of James v iFinex Inc. (2020 NY Slip Op 03880)





Matter of James v iFinex Inc.


2020 NY Slip Op 03880


Decided on July 9, 2020


Appellate Division, First Department


Gesmer, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 9, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Judith J. Gische,J.P.
Ellen Gesmer
Jeffrey K. Oing
Peter H. Moulton,JJ.


450545/19 11320 

[*1]In re Letitia James, etc., Petitioner-Respondent,
v
iFinex Inc., et al., Respondents-Appellants.



Respondents appeal from the order of the Supreme Court, New York County (Joel M. Cohen, J.), entered August 19, 2019, which, insofar as appealed from as limited by the briefs, denied respondents' motion to dismiss.




Steptoe & Johnson LLP, New York (Charles A. Michael of counsel), and Morgan Lewis & Bockius LLP, New York (Zoe Phillips of counsel), for appellants.
New York State Office of the Attorney General, New York (Philip J. Levitz, Scott A. Eisman and Steven C. Wu of counsel), for respondent.



GESMER, J.


This case raises important issues about the scope of the authority of petitioner, the Attorney General of the State of New York, to investigate fraud under the Martin Act. The trial court properly rejected the attempts by respondents to limit petitioner's lawful authority to protect New York residents.
Respondents BFXNA Inc. and BFXWW Inc. are wholly-owned subsidiaries of respondent iFinex (collectively iFinex). iFinex operates a trading platform known as Bitfinex on which virtual currencies can be exchanged. Respondent Tether Holdings Limited is the holding company for respondents Tether Limited, Tether Operations Limited, and Tether International Limited (collectively Tether Holdings). Tether Holdings's main activity is to issue a virtual "stablecoin" currency known as "tether" (referred to below as tether). Stablecoin is a type of [*2]virtual currency that is designed to minimize price volatility by being pegged to a stable asset or currency. Until on or about March 4, 2019, respondent Tether Holdings represented that every tether is "backed" by one U.S. dollar, and any holder of tether may redeem it for one U.S. dollar at any time. After that date, Tether Holdings changed its representation on its website to state that, while every tether is still valued at one U.S. dollar, tether is backed by Tether Holding's "reserves," which include unspecified currency, "cash equivalents," and "other assets and receivables from loans made by Tether [Holdings] to third parties," including to affiliated entities.
Nonparty Digfinex Inc. is the majority owner of iFinex and Tether Holdings. A small group of executives and employees, some of whom are or have been located in New York, operates all respondents. Each of respondents is incorporated outside of the United States and does not have a central headquarters, and none is registered for service of process in New York.
In November 2018, petitioner commenced an investigation of respondents pursuant to the Martin Act, which gives the Attorney General "broad regulatory and remedial powers" to "investigat[e] and interven[e] at the first indication of possible . . . fraud on the public and, thereafter, if appropriate, to commence civil or criminal prosecution" (Assured Guar. [U.K.] Ltd. V J.P. Morgan Inv. Mgt. Inc., 18 NY3d 341, 350 [2011] [internal quotation marks omitted]; see General Business Law [GBL] 352[1]). Petitioner began the investigation as a result of her concern that respondents lacked sufficient liquidity to permit customers to redeem tether at the represented value.
Petitioner served subpoenas on third parties pursuant to the Martin Act (GBL 352) and Executive Law § 63(12), seeking information regarding respondents' activities. After learning of this, respondents' counsel contacted petitioner on November 3, 2018 and agreed to accept service of subpoenas by email on behalf of respondents. Petitioner then delivered subpoenas seeking information and documents from January 1, 2015 forward. Respondents' counsel accepted service of the subpoenas and produced some of the requested documents and information.
In early 2019, petitioner's investigation revealed information that respondents had not disclosed to her, although it came within the scope of the information sought by the subpoenas. Respondents had previously explained to petitioner that many banks and other traditional financial institutions will not do business with unregulated or off-shore companies dealing in virtual currency. As a result, beginning in 2014, iFinex had used a third-party foreign entity to process customer deposits and withdrawals. In or about February 2019, petitioner learned that, since mid-2018, this entity had refused to provide iFinex with close to $1 billion of their commingled client and corporate funds. In addition, respondents advised petitioner that, in November 2018, Tether Holdings had transferred $625 million to iFinex, and that iFinex was planning to take a $900 million line of credit from Tether Holdings. Petitioner expressed concern that the latter transaction might constitute a conflict of interest, but respondents nevertheless went ahead with the transaction and only told petitioner that they had done so after the deal had closed.
Concerned that these events indicated that iFinex was in serious financial trouble, that Tether Holdings' cash reserves backing tether would be dissipated, and that respondents had misled their customers in relation to these events, petitioner sought an order pursuant to GBL 354. That provision of the Martin Act permits the Attorney General to seek an ex parte order in Supreme Court requiring the subjects of an investigation to produce documents and testify under oath, and authorizes the court to issue a "preliminary injunction or stay as may appear to [it] to be proper and expedient" (GBL 354). In response to petitioner's request, Supreme Court issued an ex parte order dated April 24, 2019, which directed respondents to produce certain documents and stayed them from 1) taking any further action to "make any [] claim . . . on the U.S. dollar reserves held by Tether" [Holdings]; 2) making any payments to any individual associated with [*3]respondents "from the U.S. dollar reserves held by Tether" [Holdings]; and 3) altering or destroying any documents related to the investigation. Petitioner served the ex parte order on respondents, pursuant to its terms, by sending a copy of it, together with the papers on which it was based, to respondents' counsel by email, overnight delivery and hand delivery.
On or about April 30, 2019, respondents moved to modify or vacate the ex parte order. By order dated May 16, 2019, Supreme Court granted respondents' motion in part by modifying the temporary restraining order, but denied their motion to vacate it.[FN1]
On or about May 21, 2019, respondents made the instant motion, which they style as a motion to dismiss on the basis of lack of subject matter jurisdiction (CPLR 3211[a][2]) and lack of personal jurisdiction (CPLR 3211[a][8]). Supreme Court denied the motion by order entered on August 19, 2019, and respondents now appeal.
At the outset, under the Martin Act's statutory scheme, once Supreme Court has issued an order responding to a GBL 354 application, it has no further role in the Attorney General's investigation, except to rule on a motion by either party to vacate or modify the order, as respondents made here. Accordingly, once the court issued the order authorized by GBL 354 on April 24, 2019, and modified it by order dated May 16, 2019, the proceeding before it was concluded and there was no action or proceeding for Supreme Court to "dismiss" on May 21, 2019 when respondents filed their motion that resulted in the order now before the court. All that remained was the Attorney General's ongoing investigation, in which, by statute, the courts have no further role at this stage. Indeed, neither party cites to, and this Court is unaware of, any prior case in which the subject of a Martin Act investigation has moved to "dismiss" an application by the Attorney General for an order pursuant to GBL 354. Nevertheless, I consider each of respondents' three arguments in support of their appeal of the motion court's August 19, 2019 order, and reject each for the reasons discussed below.
First, respondents argue that tether does not qualify as a security or commodity as those terms are defined in the Martin Act, and that the motion court thus lacked subject matter jurisdiction over them. I disagree for three reasons. As an initial matter, Supreme Court has broad general original jurisdiction, including to hear applications by the Attorney General for orders pursuant to GBL 354 under the Martin Act. Accordingly, as the motion court correctly found, respondents' challenge is actually to petitioner's authority to investigate their activities, rather than the court's jurisdiction to hear a GBL 354 application.
Moreover, the May 16, 2019 order on respondent's motion to vacate or modify the ex parte order rejected respondents' subject matter jurisdiction argument. Respondents failed to appeal from that order.
Finally, even if the court were to consider respondents' argument on the merits, the Martin Act's definition of commodities as including "any foreign currency, any other good, article, or material" (GBL 359-e[14]) is broad enough to encompass tether [FN2]. Indeed, federal courts and the Commodities Futures Trading Commission have found that virtual currencies are commodities under the Commodities Exchange Act, which defines the term more narrowly than does the Martin Act ("all other goods and articles . . . and all services rights and interests . . . in which contracts for future delivery are presently or in the future dealt in" [7 USC § 1a(9) [*4](emphasis added)]; Commodities Future Trading Commn. v McDonnell, 287 F Supp 3d 213, 224-226 [ED NY 2018]; Matter of Coinflip, Inc., 2015 WL 5535736, *2, 2015 CFTC LEXIS 20, *6 [Sept. 17, 2015, CFTC Docket No. 15-29]).
Accordingly, the motion court properly denied the branch of respondents' motion to dismiss based on subject matter jurisdiction.
Next, respondents argue that Supreme Court lacked specific personal jurisdiction over them because petitioner failed to demonstrate a sufficient connection between respondents' activity in New York and the activities she is investigating. This argument is unavailing.
On a motion pursuant to CPLR 3211(a)(8) to dismiss for lack of personal jurisdiction, the party asserting jurisdiction has the burden of demonstrating "satisfaction of statutory and due process prerequisites" (Stewart v Volkswagen of Am., 81 NY2d 203, 207 [1993]). Under CPLR 302(a)(1), New York's long-arm jurisdiction statute, "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted" (Deutsche Bank Sec., Inc. v Montana Bd. of Invs., 7 NY3d 65, 71 [2006][internal quotation marks omitted], cert denied 549 US 1095 [2006]). Due process is satisfied when a foreign entity has "minimum contacts" with the State and exercise of jurisdiction does not "offend traditional notions of fair play and substantial justice" (International Shoe Co. v Washington, 326 US 310, 316 [1945] [internal quotation marks omitted]; see also LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 216 [2000]). It is "rare" for personal jurisdiction to be permitted under the long-arm statute and prohibited by due process considerations (Rushaid v Pictet & Cie., 28 NY3d 316, 331 [2016] [internal quotation marks omitted]). Moreover, "[w]here the purpose of the proceeding is to protect the citizens of the State from potentially dangerous consequences, less is required than might otherwise be the case" (Matter of La Belle Creole Intl., S. A. v Attorney-General of the State of N.Y., 10 NY2d 192, 198 [1961]).
Here, petitioner is investigating, inter alia, whether respondents have committed fraud (as broadly defined in the Martin Act) "within or from" New York (GBL 352) by making untrue claims about the cash reserves backing tether and their ability to honor customer withdrawal requests. She has sought documents and information from respondents going back to 2015, which is well within the applicable six-year statute of limitations (CPLR 213[9]).
iFinex admits that it permitted New York-based customers to trade tether on the Bitfinex platform until January 30, 2017. Respondent Tether Holdings did not expressly prohibit redemption of tether by New York-based customers until November 27, 2018. Petitioner included in her motion papers documents obtained in her investigation indicating that New York-based customers nevertheless used the Bitfinex platform to trade tether after both of these dates, including as recently as May 14, 2019 (see Archer-Vail v LHV Precast, Inc., 168 AD3d 1257, 1261-1262 [3d Dept 2019] [showing that the defendant operated an "interactive website" that made products available to New York customers was a "sufficient start" to showing of long-arm jurisdiction on motion to dismiss]).
In addition, respondents do not deny that, until at least early 2018, they had an executive who resided in and conducted business on their behalf within New York, including with customers who appear to be New York-based (see Kreutter v McFadden Oil Corp., 71 NY2d 460, 467 [1988][long-arm jurisdiction established where agent "engaged in purposeful activities in this State . . . for the benefit of and with the knowledge and consent" of foreign corporation defendants]. While respondents claim that the customer involved in certain correspondence attached to petitioner's papers was a "United Kingdom entity," they do not deny that the entity acted through a representative located in New York.
Furthermore, respondents had active accounts with New York banks until at least October [*5]2018 (see Licci v Lebanese Can. Bank, SAL, 20 NY3d 327, 339 [2012] [foreign defendant's "repeated use" of New York bank accounts to effect wire transfers on behalf of foreign client sufficient to exercise long-arm jurisdiction]), and retained New York professional firms to review tether cash reserves and to make public statements on respondents' behalf about the Bitfinex platform and tether cash reserves in 2017 and 2018 (see Courtroom Tel. Network v Focus Media, 264 AD2d 351, 353 [1st Dept 1999] [long-arm jurisdiction established where the defendant relied on agents "to perform commercial activities in New York for [their] benefit"]).
Accordingly, petitioner has demonstrated that respondents' activities in New York were sufficiently related to the subjects of petitioner's investigation to satisfy specific personal jurisdiction for the purposes of GBL 354. It bears noting that, in an ordinary case, the party opposing a motion to dismiss based on personal jurisdiction need not establish that there is personal jurisdiction. Rather, she need only make a "sufficient start" in demonstrating, prima facie, the existence of personal jurisdiction, since facts relevant to this determination are frequently in the exclusive control of the opposing party and will only be uncovered during discovery (Peterson v Spartan Indus., 33 NY2d 463, 466-467 [1974]; see also Universal Inv. Advisory SA v Bakrie Telecom Pte, Ltd., 154 AD3d 171, 179-180 [1st Dept 2017]). Here, some of the information the ex parte order requires respondents to produce to petitioner is relevant to this issue and may reveal additional bases for the court's exercise of personal jurisdiction over respondents if and when petitioner commences an action against them, including documents concerning Bitfinex users and tether holders residing or doing business in New York. For that reason, courts generally permit discovery to proceed solely on the jurisdictional issue in the first instance following a dismissal motion on that basis and a prima facie showing of the existence of personal jurisdiction.
However, what is at issue here is not the existence of personal jurisdiction for a lawsuit but merely for an investigation, which requires a far lighter showing. Petitioner has made a sufficient showing of personal jurisdiction in the context of this Martin Act investigation for Supreme Court to have issued the ex parte order pursuant to GBL 354. The Martin Act authorizes the Attorney General to investigate securities or commodities fraud (as those terms are defined by the Act) "within or from" New York (GBL 352). Petitioner may properly investigate a foreign entity if she "has a reasonable basis for believing that [it] has violated a New York statute" (La Belle Creole, 10 NY2d at 198). As the Court of Appeals found in relation to the Attorney General's issuance of a subpoena on a foreign corporation pursuant to her broad investigative powers, her request for an order pursuant to GBL 354 "is not rendered improper because it may produce the evidence required to establish that the petitioner is doing business in New York" (id.). Finally, respondents argue that Supreme Court lacked personal jurisdiction over them because petitioner improperly served the ex parte order when she delivered a noncertified copy to respondents' counsel by hand, email, and overnight delivery. I disagree for two reasons.
First, this Court's decision in Abrams v Lurie (176 AD2d 474 [1st Dept 1991]), relied upon by respondents, is not determinative here. In Lurie, we found that a GBL 354 order must be served in accordance with the CPLR, and held that, where there was no showing that personal service on an individual was "impracticable" (CPLR 308[5]; see also CPLR 311[b]), service upon him by mail was improper. In doing so, this Court stated:
"A General Business Law § 354 order is closely analogous to both a subpoena and a temporary restraining order, both of which, under the CPLR, must be served in the same manner as a summons (CPLR 2303, 6313[b]). In the case of a temporary restraining order, the court is expressly empowered to order service otherwise, but it is generally recognized that this power is exercised only [*6]when a temporary restraining order is issued in the context of an already pending action" (Lurie, 176 AD2d at 476).
There is no indication that the individual respondent in Abrams was aware of the Attorney General's investigation, much less that he had already been cooperating and had agreed to accept service of a subpoena, as is the case here. Where respondent is aware of the investigation and has been cooperating, the GBL 354 order is analogous to a temporary restraining order issued in an "already pending action." Accordingly, service pursuant to CPLR 6313 is appropriate. Unlike CPLR 311(b), CPLR 6313(b) does not require a showing of impracticability, but rather provides: "Unless the court orders otherwise, a temporary restraining order together with the papers upon which it was based, and a notice of hearing for the preliminary injunction, shall be personally served in the same manner as a summons" (emphasis added). Here, the court did order otherwise, and specifically authorized that service "of a copy of the Order, and the papers upon which it was granted, on counsel for Respondents" would be sufficient.
Furthermore, whether a defect in service is jurisdictional or a mere technical irregularity that a court may overlook under CPLR 2001 depends upon whether it "affect[s] the likelihood that the [pleading] will reach [the] defendant and inform him that he is being sued" (Ruffin v Lion Corp, 15 NY3d 578, 583 [2010]). In making this determination, "courts must be guided by the principle of notice to the defendant—-notice that must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'" (id. at 582 [quoting Mullane v Central Hanover Bank & Trust Co., 339 US 306, 314 [1950]). The Court of Appeals noted in Ruffin, in dicta, that mailing, emailing, or delivering the pleading to the wrong person all "would present more than a technical infirmity, even if defendant actually receives the documents, inasmuch as these methods in general introduce greater possibility of failed delivery" (id. at 583). In Ruffin, the Court held that personal service upon the defendant bus company at its out-of-state headquarters by a person not authorized under the CPLR to make such service was a mere technical infirmity, which the motion court properly overlooked in denying the defendant's motion to vacate the default judgment against it.
Here, petitioner's service of a copy, rather than a certified copy as required by GBL 355, is unquestionably a mere technical infirmity, since it had no impact on the likelihood of failed delivery. Moreover, the order on its face required service only of a copy,' not a certified copy. Petitioner's service by hand, email and overnight delivery on respondents' attorney with whom she had been dealing throughout her investigation was reasonably calculated to inform respondents of the existence of the GBL 354 order. As discussed above, the ex parte order in this case is not a summons or complaint informing respondents for the first time of a lawsuit's commencement. Rather, it is simply the next step in petitioner's investigation of respondents, who were well aware of it and were cooperating with it.
Moreover, even if service had been improper, petitioner argues that respondents waived any objection based on lack of personal jurisdiction because of inadequate service by failing to raise it in their initial motion to vacate or modify the ex parte order. I agree. Because a GBL 354 application does not result in a final order from a court after trial or summary judgment, there is nothing to "dismiss." Respondents' only remedy is to seek to vacate or modify the GBL 354 order. Accordingly, respondents' earlier motion to vacate the GBL 354 order was, procedurally speaking, their motion to dismiss. By failing to make their case as to lack of personal jurisdiction based on improper service in that motion, the determination of which respondents have not appealed, respondents have waived this argument.
Accordingly, the order of the Supreme Court, New York County (Joel M. Cohen, J.), [*7]entered August 19, 2019, which, insofar as
appealed from as limited by the briefs, denied respondents' motion to dismiss, should be affirmed, without costs.
All concur.
Order, Supreme Court, New York County (Joel M. Cohen, J.), entered August 19, 2019, affirmed, without costs.
Opinion by Gesmer, J. All concur
Gische, J.P., Gesmer, Oing, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 9, 2020
CLERK



Footnotes

Footnote 1:Respondents did not appeal from that order and it is not before us.

Footnote 2:Because tether is easily encompassed by the statute's definition of "commodity," there is no need to reach the issue of whether it may also qualify as a "security" under the Martin Act.